UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| DOROTHY DOAKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:09 CV 367 |
| | ) | |
| SAFECO INSURANCE COMPANY | ) | |
| OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

<u>OPINION and ORDER</u>

This matter is before the court on defendant's motion for summary judgment
(DE # 74). For the reasons set forth below, the motion is granted.

I.      BACKGROUND

In January of 2008, plaintiff Dorothy Doaks lived on Sheridan Street in South
Bend, Indiana, with her 15-year-old son. She had lived there for over 17 years. (DE # 77-
2 at 10, Dep.[1] 13:16-20.) The residence was insured under a homeowners insurance
policy that she applied for, and was granted, in November of 2007. (DE # 77-11.)

For 14 years prior, plaintiff had provided daycare and babysitting services to
various individuals, on and off. (DE # 77-2 at 13, Dep. 18:1-2.) But for at least the two to
three years immediately preceding 2008, possibly longer, plaintiff was actively engaged

---

[1] References to "Dep." in this opinion refer to the various depositions of the
plaintiff which took place after this lawsuit was filed. (DE ## 77-2, 77-3, 77-4.)

in childcare services (DE # 77-3 at 4, Dep. 105:6-10), not counting a break for some medical issues (DE # 77-2 at 13, Dep. 18:2-11).

Plaintiff provided childcare seven days a week. (DE # 77-2 at 27, Dep. 118:14-16.) She typically cared for four children (DE # 77-2 at 13-14, Dep. 18:16-17, 20:25), and considered watching up to five (DE # 77-3 at 3, Dep. 101:16-18). To help her with her childcare duties, plaintiff hired an assistant. (DE # 77-2 at 18-20, Dep. 77:1 - 79:4.) Plaintiff advertised for more business, posting fliers in a laundromat every six months or so, though possibly less often than that. (DE # 77-3 at 3, Dep. 99:22 - 101:8.)

Although one of the children plaintiff cared for belonged to a relative whom she did not charge (DE # 77-2 at 16, Dep. 23:6-9), plaintiff generally received close to $500 per month from childcare services (DE # 77-6 at 6, Answers to Interrog. 13). For one child, she received childcare payments from the State of Indiana. In order to receive these payments, plaintiff undertook additional safety precautions and underwent medical training, medical testing, and home inspections. (DE # 77-2 at 28, Dep. 123:7-18; DE # 77-3 at 4, Dep. 105:11 - 106:24.) Plaintiff was not employed elsewhere, and other than Social Security benefits, food stamps, and the occasional monetary gift from family (DE # 77-3 at 6, Dep. 111:6-18), plaintiff had no source of income other than babysitting. (DE # 77-2 at 25, Dep. 102:5-15, 13-18.) For the 2007 tax year, Plaintiff reported $5,722 in childcare income on her federal tax returns (DE # 77-2 at 25, Dep. 102:5-15), reported no income from any other source (*id.*), and listed her occupation on her tax return as "daycare provider" (DE # 77-16 at 12).

In January of 2008, plaintiff's home was destroyed in a fire. During the investigation, defendant discovered that plaintiff had been using the insured premises to provide childcare services, despite the fact that on her insurance application plaintiff had answered "No" to the question "Is there a business on the premises?" (DE # 77-11 at 9.) The contract included a misrepresentation clause, which stated: "This policy will be void if any insured has, before or after a loss[,] . . . intentionally concealed or misrepresented any material fact or circumstance; or . . . made false statements or engaged in fraudulent conduct relating to this insurance." (DE # 77-12 at 34.) Defendant ultimately denied plaintiff's claim.

Plaintiff then filed suit, claiming that she was entitled to benefits under the insurance contract and that defendant should be estopped from denying the claim. (DE # 1.)[2] Plaintiff also seeks one year of lost babysitting income at a rate of $500 per month. (DE # 77-6 at 6, Answers to Interrog. 14.) Defendant moved for summary judgment, arguing that plaintiff's misrepresentation regarding her use of the home for business purposes permits defendant to rescind the contract, that plaintiff's failure to cooperate with the investigatory process permits the same, and that plaintiff could not satisfy the elements of a claim for equitable estoppel. (DE ## 74, 75.) In a three-and-a-half page

---

[2] Plaintiff's complaint also included a bad faith claim with a request for punitive damages (DE # 1 at 2-3), but she later voluntarily dismissed this claim. (DE # 49.)

response, plaintiff briefly contested only the first two arguments.[3] (DE # 83.) Defendant filed a reply. (DE # 85.) Accordingly, the motion is ripe for ruling.

## II.   LEGAL STANDARD

A motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The parties' burdens in the context of a motion for summary judgment depend on whether the movant or the non-movant would ultimately bear the burden of proof on a disputed issue at trial. Where the movant would bear the burden of proof, the movant "must show that the evidence . . . is 'so one-sided that . . . [the movant] must prevail as a matter of law'" in order to obtain summary judgment in his favor. *Reserve Supply Corp. v. Owens-Corning Fiberglass Corp.*, 971 F.2d 37, 42 (7th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)); *Addicks Servs., Inc., v. GGP-Bridgeland, LP*, 596 F.3d 286, 293 (5th Cir. 2010) (where movant also bears burden of proof, "movant must establish

---

[3] Plaintiff also failed to submit a "Statement of Genuine Disputes" identifying material facts that she believed were genuinely disputed, as required by N.D. IND. LOCAL R. 56-1. Such a statement is a critical element of any response to a motion for summary judgment, because without it, the movant's version of the facts are accepted as undisputed. In this case, however, few facts are actually disputed, and even if plaintiff's error is overlooked, she still cannot survive defendant's motion.

beyond peradventure" all essential elements in order to warrant judgment in his favor").[4]

The court's role in deciding a summary judgment motion is not to evaluate the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson,* 477 U.S. at 249-50; *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 443 (7th Cir. 1994). In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.,* 45 F.3d 231, 234 (7th Cir. 1995).

## III.    DISCUSSION

The parties' primary dispute is whether defendant may rescind the contract because plaintiff made a material misrepresentation on her insurance application as to whether or not she operated a "business" on the premises. Because "a party that seeks to avoid a contract bears the burden of proof on matters of avoidance," defendant ultimately has the burden of proof on this issue. *In re Paternity of M.F.,* 938 N.E.2d 1256, 1260 (Ind. Ct. App. 2010). It is undisputed that plaintiff stated, on her application, that

---

[4] Where the movant does not bear the burden of proof at trial, the oft-quoted rule of *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986), which involves the shifting of burdens between the movant and non-movant, applies. As explained in more detail below, defendant bears the burden of proof on the only issue warranting discussion in this case, so the only summary judgment standard that is necessary to apply is the one set forth in *Reserve Supply*; the burden-shifting standard of *Celotex* "is inapplicable." *Reserve Supply,* 971 F.2d at 42.

she was not running a business out of her home. (*See* DE # 77-11 at 9 (plaintiff's insurance application).) However, the parties dispute whether plaintiff's daycare activities constituted a "business" under Indiana law.

When interpreting insurance documents under Indiana law, "an insured is engaged in a business pursuit only when he pursues a continued or regular activity for the purpose of earning a livelihood." *Am. Family Mut. Ins. Co. v. Bentley,* 352 N.E.2d 860, 865 (Ind. Ct. App. 1976) (adopted by *Frankenmuth Mut. Ins. Co. v. Williams by Stevens,* 690 N.E.2d 675, 680 (Ind. 1997)). There are two parts to this inquiry: (1) whether the insured pursues a continued or regular activity; and (2) whether the purpose of the activity is earning a livelihood. *See id.*

As to the first part of the test, whether the insured pursued a continued or regular activity, a one-time occurrence of a particular activity does not render the activity continued or regular. *Bentley,* 352 N.E.2d at (homeowner did not engage in continued or regular activity by renting portion of garage to Boy Scout troop for storage of canoes and camping equipment for nominal amount of money). However, even irregular activity that is, at times, a daily occurrence leans towards the "continuous and regular" end of the spectrum. *Frankenmuth Mut. Ins. Co. v. Williams by Stevens,* 690 N.E.2d 675, 680 (Ind. 1997) (court surmised that woman who babysat for up to four to five children at a time on irregular basis that became "at times a daily activity" for her was engaged in continuous and regular business activity, but ultimately found question of fact on second part of *Bentley* test).

6

In this case, it is undisputed that plaintiff engaged in childcare services for at least two to three years before the fire, and maybe longer (DE # 77-3 at 4, Dep. 105:6-10), not counting a break for some medical issues (DE # 77-2 at 13, Dep. 18:2-11), and that she provided childcare seven days a week (DE # 77-2 at 27, Dep. 118:14-16). It is further undisputed that plaintiff typically cared for four children (DE # 77-2 at 13-14, Dep. 18:16-17, 20:25), and considered watching up to five (DE # 77-3 at 3, Dep. 101:16-18). Additionally, plaintiff advertised for more business, posting fliers in a laundromat every six months or so, maybe less (DE # 77-3 at 3, Dep. 99:22 - 101:8). These facts reveal no dispute that plaintiff engaged in a "continued or regular activity" satisfying the first part of the *Bentley* test, even if her childcare services were irregular in nature and varied in intensity over time.

As to the second part of the test, whether the homeowner engaged in the activity in order to earn a livelihood, Indiana courts consider numerous fact-sensitive factors. First, courts consider whether a homeowner is gainfully employed elsewhere. *Asbury v. Indiana Union Mut. Ins. Co.,* 441 N.E.2d 232, 242 (Ind. Ct. App. 1982) (plaintiff was gainfully employed as mill operator, and only hunted and skinned animals as a hobby, so the latter was not considered a business under his homeowners insurance policy). However, other sources of employment or income may not matter as much if most of the homeowner's income comes from the activity in question. *Mid-Am. Fire & Cas. Co. v. Shoney's, Inc.,* 843 N.E.2d 548, 552 (Ind. Ct. App. 2006) (though defendant was a college professor, he regularly engaged in numerous real estate business ventures and often

7

made more money from his business investments than he did as a college professor, so

his real estate pursuits constituted a business under his homeowners insurance policy).

Finally, the significance of the income to the homeowner appears to weigh into the

analysis. *Frankenmuth,* 690 N.E.2d at 681 (court found question of fact regarding

whether a babysitter relied on her babysitting services as a means of earning a

livelihood because babysitter considered the amount of money she earned so

insignificant that she did not report it on her federal income tax return). *Id.*

In this case, it is undisputed that plaintiff was not employed elsewhere, and had

no source of income other than babysitting. (DE # 77-2 at 25, Dep. 102:5-15, 13-18.)

Further, although one of the children plaintiff cared for belonged to a relative whom

she did not charge (DE # 77-2 at 16, Dep. 23:6-9), plaintiff stated in her answers to

defendant's interrogatories that she "generally was paid close to $500 per month" for

her services (DE # 77-6 at 6, Answers to Interrog. 13), and was seeking, in this lawsuit,

one year of lost babysitting income at that rate (DE # 77-6 at 6, Answers to Interrog. 14).

These facts demonstrate that plaintiff relied on her babysitting activities as a means of

earning a living. Further, the fact that plaintiff advertised for more business (DE # 77-3

at 3, Dep. 99:22 - 101:8) suggests that she depended on the income and wanted it to

continue. Plaintiff also hired an assistant (DE # 77-2 at 18-20, Dep. 77:1- 79:4) and

received payments from the state for one child, which necessitated additional safety

precautions, medical training, medical testing, and home inspections (DE # 77-2 at 28,

Dep. 123:7-18; DE # 77-3 at 4, Dep. 105:11- 106:24), suggesting that plaintiff's activities

8

were more like a business than a hobby or something to do in her spare time. Finally, unlike the babysitter in *Frankenmuth*, plaintiff reported her childcare income on her federal tax returns for the year preceding the fire (DE # 77-2 at 25, Dep. 102:5-15), reported no income from any other source (*id.*), and listed her occupation on her tax return as "daycare provider" (DE # 77-16 at 12). In total, the evidence in the record reveals no genuine issue as to whether plaintiff relied on her babysitting services as a means of earning a living, satisfying the second element of the *Bentley* test.

Plaintiff points out that the South Bend Municipal Code allows individuals to conduct childcare activities out of their homes in "R: Single-Family Districts," such as the district in which plaintiff's home was presumably located. SOUTH BEND MUN. CODE § 154.106 (entitled "Permitted Uses"). According to plaintiff, this suggests that plaintiff's childcare activities were not technically "business" activities. However, the ordinance plaintiff refers to is a zoning law that establishes which land uses are permitted in a particular area. There is no Indiana law suggesting that such laws should weigh into the analysis of whether a homeowner is operating a "business" out of her home for purposes of interpreting an insurance contract. Further, plaintiff's argument defies logic; the fact that South Bend allows a homeowner to generate income in a particular area does not mean that the income-generating activity does not constitute a "business." Indeed, other "permitted uses" under Section 154.106 include golf courses, cemeteries, and farms, but no reasonable person would argue that such entities do not conduct "business" activities. Rather, Section 154.106 seems to permit a number of

9

residential and business uses that the statute itself describes as "compatible with residential development located at the periphery of an urban area." *Id.* § 154.105 (preceding "§ 154.106 Permitted Uses," and entitled "Intent"). The fact that home daycare is one of them does not mean that home daycare is not a business.

As demonstrated above, there is no genuine factual dispute as to whether plaintiff was operating a "business" out of her home. There is also no genuine factual dispute as to whether plaintiff represented on her insurance application that she was *not* operating a "business" out of her home. Accordingly, there is no genuine factual dispute as to whether plaintiff made a misrepresentation on her insurance application. The only remaining issue is whether the representation was "material."

Under Indiana law, a misrepresentation or omission of fact in an insurance application, relied on by the insurer in issuing the policy, renders the coverage voidable at the insurance company's option, so long as the misrepresentation was "material." *Colonial Penn Ins. Co. v. Guzorek,* 690 N.E.2d 664, 672 (Ind. 1997); *Allied Prop. and Cas. Ins. Co. v. Good*, 938 N.E.2d 227, 233 n.4 (Ind. Ct. App. 2010). The insured in *Guzorek* did not list her husband as a licensed driver who lived in her household because his license was suspended. On a subsequent document that was submitted to the insurer, the insured failed to list her husband as a "customary operator" of her cars even though she knew that her husband drove without a license several times a week. Her husband was involved in an auto accident, and the insurer canceled the policy. The insurer filed suit, arguing that the policy was void from the outset due to the insured's

10

misrepresentations. The *Guzorek* court described two possible tests for determining the materiality of the misrepresentations:

> Under one definition, a misrepresentation or omission is "material" if knowledge of the truth would have caused the insurer to refuse the risk or to charge a higher premium for accepting the risk. This inquiry focuses on whether the representation was false and material to the decision to issue the policy. Whether the applicant intended to mislead or knew of the falsity is irrelevant[.] . . . A second approach to materiality in a case, such as this, where rescission is attempted after a loss has been incurred, would measure the materiality not against the underwriting decision, but rather against the loss. In other words, coverage of the incurred loss would be voided if the misrepresentation affected that risk, but not all coverage would necessarily be voided.

690 N.E.2d at 673 (citations omitted).

The *Guzorek* court avoided choosing a test to apply in that case, finding that the result would be the same under either one. Under the first vew, the insurer could rescind the policy because it claimed it would not have written a policy for her due to her husband's presence in the household. Under the second view, the insurer could rescind the policy because, as the driver of the car, the husband's existence and driving record were clearly material to the loss actually incurred. Accordingly, the court summarized, the misrepresentation was "material" under either test. *Id.* at 673-74.

In this case, defendant argues for application of the first test, while plaintiff advocates for the second, with each side hoping to benefit from its preferred test. The passage from *Guzorek* describing the two tests has spurred some discussion in the lower Indiana courts. The second test, in particular, has been met with confusion, as partial

11

recision of a contract is not firmly recognized in Indiana, and *Guzorek* provided no citation or precedent to explain its reasoning.

The Indiana appellate courts' recent opinions on the subject have concluded that because "general contract law plainly permits the complete rescission of a contract," *Guzorek* could not have "intended to overrule decades of well-established contract law" without doing so "explicitly and carefully." *Allianz Ins. Co. v. Guidant Corp.,* 884 N.E.2d 405, 415 (Ind. Ct. App. 2008); *see also Allied*, 938 N.E.2d at 233 n.6 (2010). The *Allianz* court further reasoned that the specific issue before *Guzorek* was whether an insurer's common law right to rescind coverage based on fraud survived the enactment of financial responsibility laws requiring drivers to carry insurance or other proof of financial responsibility, *Allianz,* 884 N.E.2d at 415, and noted that *Guzorek* did not rely on many cases outside of the automobile insurance context in reaching its decision, *id.* at 416. Accordingly, *Allianz* and *Allied* have concluded, the second *Guzorek* materiality test is limited to cases involving the interplay of Indiana's financial responsibility laws and automobile insurance laws. *Id.; Allied,* 938 N.E.2d at 233 n.6. In situations involving "homeowners insurance, not car insurance, the second approach does not apply." *Allied,* 938 N.E.2d at 233 n.6.

This court now follows the recent trend in Indiana jurisprudence to consider the second materiality "test," as articulated in *Guzorek,* to be limited to particular types of cases involving automobile insurance. As this case involves homeowners insurance, the court will utilize the first *Guzorek* test, which considers whether knowledge of the truth

12

would have caused the insurer to refuse the risk or to charge a higher premium for accepting the risk. 690 N.E.2d at 673. As explained above, "this inquiry focuses on whether the representation was false and material to the decision to issue the policy. Whether the applicant intended to mislead or knew of the falsity is irrelevant." *Id.*

Defendant has submitted the affidavit of William S. Burke, the Underwriting Manager in defendant's Underwriting Department. (DE # 76-1 at 2.) Burke attests that he has examined plaintiff's underwriting files, and is familiar with defendant's underwriting policies and guidelines. (*Id.*) Burke further states that based on defendant's underwriting guidelines, defendant would not have issued this particular policy of homeowners insurance if plaintiff had disclosed that she operated a child daycare business out of her home. (*Id.*) Plaintiff has provided no evidence on this issue. No reasonable juror could conclude that in light of knowledge of the existence of numerous children on the property, seven days a week, in connection with a daycare business, an insurer would not have provided a different policy to plaintiff than that typically provided to a homeowner, or that a different premium would not have been charged given the appreciable difference in risk. Accordingly, the court finds that there is no genuine dispute as to whether the first *Guzorek* test of materiality is satisfied. Because the court finds that there is no genuine issue of material fact as to whether plaintiff made a material misrepresentation of fact on her application for insurance, summary judgment is appropriate for defendant on plaintiff's claims based on the insurance contract. *Guzorek,* 690 N.E.2d at 673 (summary judgment appropriate because

"Colonial Penn contends, and the Guzoreks do not appear to dispute, that its underwriting guidelines at that time prohibited writing policies for applicants, or members of their household, who had a suspended or revoked license within the prior five years.").[5]

Because the court finds that defendant may rescind the insurance contract due to a material misrepresentation in the insurance application, it need not address defendant's other arguments for recission. Nor will the court address defendant's motion for summary judgment as it pertains to plaintiff's equitable estoppel claim; plaintiff made no attempt to defend her claim after it was attacked by defendant's motion for summary judgment, so the court considers the claim abandoned. *Palmer v. Marion County,* 327 F.3d 588, 597-98 (7th Cir. 2003) (failure to address claim in response to summary judgment motion is deemed abandoned); *Domka v. Portage County, Wis.,* 523 F.3d 776, 783 (7th Cir. 2008) ("It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered. If it does not do so, and loses the motion, it cannot raise such reasons on appeal.").

---

[5] The Indiana Supreme Court recently reiterated that an insurer may only rescind a contract due to a material misrepresentation if the insurer returns any premiums paid by the homeowner. *Dodd v. Am. Family Mut. Ins. Co.,* 956 N.E.2d 769, 773 (Ind. Ct. App. 2011), *aff'd* slip. op. at 3 (Ind. March 5, 2013). However, defendant maintains, and plaintiff does not dispute, that it has already returned plaintiff's premiums to her. (DE # 76-1 at 3.) Accordingly, the "return of premiums" caveat appears to be a non-issue in this case.

**IV.    CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment (DE # 74)

is **GRANTED.** There being no claims remaining against any defendant in this case, the

Clerk is hereby directed to **ENTER FINAL JUDGMENT** in this case stating:

> Judgment is entered in favor of defendant Safeco Insurance
> Company of America; and against plaintiff Dorothy Doaks,
> who shall take nothing by way of her complaint.

**SO ORDERED.**

Date: March 12, 2013

 s/ James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT

15